IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANITA GARG, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 05 C 3947 |
| JOHN E. POTTER, Postmaster General, and, UNITED STATES POSTAL SERVICE, | ) ) ) ) | HONORABLE CHARLES R. NORGLE |
| Defendants. | ) ) | |

**OPINION AND ORDER**

CHARLES R. NORGLE, District Judge

Before the court is Defendant's Motion for Summary Judgment brought pursuant to Federal Rule of Civil Procedure 56(c). For the following reasons, Defendant's Motion for Summary Judgment is granted.

## I. BACKGROUND[1]

### A. Facts

This case arises out of the termination of Plaintiff Anita Garg ("Garg") from Defendant United States Postal Service ("the Postal Service") in 2005. In 1987, Garg worked in the Skokie, Illinois Post Office as a part-time clerk, but was terminated for falsification of her employment application. Specifically, Garg failed to disclose that she had been terminated from the Mt. Prospect, Illinois Post Office in 1986 for unsatisfactory performance. The 1986 termination is

---

[1] The court takes the undisputed facts from the parties' Local Rule 56.1 Statements, and notes disputed facts within the text.

1

not the subject of the current suit.

In 1989, Garg was re-instated at the Streamwood, Illinois postal facility as a part-time flexible clerk. She worked on what the Postal Service calls "tour 1" which started around midnight. The majority of Garg's duties included the distribution of mail. According to the Postal Service, Garg was medically qualified to perform the job, did not develop any allergies or rashes as a result of handling mail, and left that position for personal reasons in 1993.

According to the Postal Service, the Palatine facility operates on three shifts. Tour 1 lasts from 11:00 p.m. through 7:00 a.m. Tour 2 lasts from 7:00 a.m. until 3:30 p.m., and Tour 3 goes from 3:30 p.m. through 11:00 p.m. The majority of mail processing occurs on Tours 1 and 3, with Tour 1 being the busiest of the two. Tour 2 is mainly a maintenance and cleaning time, with limited sorting operations.

Six years later, in 1999, the Postal Service again hired Garg. Between March 27, 1999 and May 19, 2001, Garg worked as a mail processor at the Postal Service's Palatine Processing and Distribution Center, located in Palatine, Illinois. Garg's duties lincluded working with a sorter machine, moving mail into tubs, and taking mail out of bags and placing it into sorting machines. At the time Garg begain her third tour of employment, the Post Office states that she was medically qualified to perform all the functions necessary for her job. Additionally, Garg did not suffer from any medical ailment, and had no disabilities or impairments that would have prevented her from her completing the tasks required of her.

Under the collective bargaining agreement ("CBA") between the Post Office and its employees, workers are placed into open positions based on their "craft seniority date" which is determined by the date that specific employee was hired into a particular craft. The clerk craft,

for example, includes mail processors. An employee bids for an open position within their craft, and selection of that employee is determined by the employee's seniority. If an employee wishes to change crafts, he or she must first apply to do so, which results in a lower seniority date within that new craft for bidding purposes. By July 2000, Garg had become a "full-time flexible regular mail processor."

For the past ten years, Dr. Eva Ostrowski ("Ostrowski") has been a contract physician for the Postal Service. Her duties include the administration of fitness-for-duty examinations and conducting employee post-offer physicals and drug screening. Dr. Ostrowski did not have any managerial duties at the Palatine facility.

Beginning in late 2000 and into 2001, Garg made several requests to change her work schedule from tour 1 to either tour 2 or tour 3. Garg complained that she suffered from allergy symptoms while at Palatine, and that these symptoms were worse at night. On July 14, 2000, Dr. William McMahon ("McMahon"), a contract physician for the Post Office, wrote a note to Alan Lipschultz ("Lipschultz"), the manager of distribution operations ("MDO") at Palatine in regards to Garg's medical condition. Dr. McMahon indicated that the medical documentation Garg submitted in support of her request, including a narrative by her treating physician, did not provide a valid reason to grant a detail change.

The Postal Service claims that between September 30, 2000 and April 6, 2001, Lipschultz accommodated Garg's schedule change request by moving her to the data entry room on tour 3. The data entry room is commonly known as the "blue room." According to Lipschultz, he usually limited such details to 90 days. Moreover, Garg's re-assignment to tour 3 was a deviation from the normal procedures because her bid assignment required her to work on tour 1,

3

and under the seniority bidding system and large volume of mail the Palatine facility processed, employees must work their assigned tour in order for the facility to handle the high volume of mail. In the blue room, employees used computer terminals to code mail that could not be processed through the sorting equipment. As a result of technological updates in the mail processing equipment, the data entry room in Palatine, which the Postal Service describes as a "dusty environment," was phased out by late 2001.

Throughout March 2001, the Postal Service permitted Garg to work a modified shift of only daytime hours, and gave her limited duties during this time. Then, between April 9 through April 20, 2001, Garg did not report to work because, according to her, she felt that her allergy condition became aggravated by her work environment. On April 20, 2001, Joseph Kalisz ("Kalisz"), the "acting integrated resource management site coordinator" at the Palatine facility, denied Garg's April 9 request for leave through May 1, 2001. As a result, the Post Office classified Garg's absence as leave without permission.

On April 25, 2001, Garg developed a rash on her neck, hands, and legs, and was taken to the emergency room at Northwest Community Hospital ("Northwest"). The treating doctor at the hospital instructed her to take Benedryl, and stay home from work the next day. On April 27, when Garg returned to her job, she again complained of a rash which began itching. Garg went back to Northwest where Dr. Michael Frumkin ("Frumkin") diagnosed her with a "persistent allergic reaction." Frumkin stated that Garg could return to work. She was discharged from the hospital the shortly thereafter, and returned to work the next day.

On May 15, 2001, Ronald Woodall, the acting Palatine plant manager, scheduled Garg for a fitness-for-duty examination administered by Dr. Ostrowski, as a result of Garg's claim that

4

her medical condition interfered with her ability to perform her job. Dr. Ostrowski found Garg not fit for duty, due to Garg's reported sensitivity to unspecified substances in the mail and air at the Palatine facility. Dr. Ostrowski advised Garg to proceed with allergy testing, so that the Postal Service may provide a safe work environment.

Then, on May 22, 2001, Kalisz sent Garg a letter, stating that Garg could not return to work until the definitive cause of her allergic reactions were identified. Kalisz relied on Dr. Ostrowski's findings when he composed this letter. Kalisz further requested that Garg inform the medical unit at the Palatine facility when Garg's allergy testing would take place, as well as the results of those tests. According the the Postal Service, Garg remained on leave without pay from May 15, 2001 through August 10, 2001. She did not timely reply.

As of October 9, 2001, Garg had not furnished the Postal Service with any medical documentation that was requested when she was found not fit for duty. As a result, the Postal Service sent Garg an "options letter," giving her the opportunity to pick from three options. Garg could either: (1) resign from her position; (2) take disability retirement, if qualified; or (3) choose optional retirement. Garg had to reply by October 19, 2001.

However on November 9, 2001, Garg responded orally to this letter and scheduled a retirement counseling appointment. Garg subsequently cancelled this appointment twice, and never rescheduled. Then, on December 19, 2001, Kalisz sent Garg a "Notice of Administrative Separation Disability," in which he informed Garg that she would be fired within 30 days from the date of the letter due to her inability to perform the duties of her position. According to the Postal Service, neither Garg nor her physicians submitted any evidence of her allergies and could not point to specific factors at the Palatine facility that she could avoid in order to prevent an

5

allergic reaction. Additionally, Garg did not undergo allergy testing that the Post Office required prior to her termination. Garg's official last day of work was May 19, 2001.

**B. Procedural History**

On June 4, 2001, Garg filed a formal complaint with the Post Office's Equal Employment Office ("EEO") in regards to her allergies suffered while at the Palatine facility. Garg also included a national origin discrimination claim in her formal complaint. Then, on November 28, 2001, Garg contacted an EEO counselor claiming that she was the victim of disability, race, age, and color discrimination, when unidentified Postal Service officials did not approve her leave request and did not give her a salary "step increase." These claims were consolidated with Garg's original complaint. On May 25, 2005, the EEO rendered its final agency decision and found that Garg failed to prove discrimination, and that her "night time" dust allergy did not qualify as a disability under the Rehabilitation Act. The EEO also found that Garg was given several accommodations despite the lack of medical proof to support her claims, and that Garg was legitimately terminated because she could not complete her job.

On July 7, 2005, Garg filed her Complaint in the Northern District of Illinois, alleging failure to accommodate and constructive discharge under the Rehabilitation Act, 29 U.S.C. §§ 791(b), 794 against the Postal Service. Then, on January 26, 2007, the Postal Service filed its Motion for Summary Judgment. Garg filed her Response on March 26, 2007, and the Postal Service filed its Reply on May 4, 2007. The Motion for Summary Judgment is fully briefed and before the court.

## II. DISCUSSION

### A. Standard of Decision

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Szymanski v. Rite-Way Lawn Maintenance Co., 231 F.3d 360, 364 (7th Cir. 2000); see also Vukadinovich v. Bd. of Sch. Tr.'s of North Newton School, 278 F.3d 693, 699 (7th Cir. 2002).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. See FED. R. CIV. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280 (1968); Spiegla v. Hall, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

When a party moves for summary judgment, the court must view the record and all inferences in a light most favorable to the non-moving party. Alexander v. City of South Bend,

7

433 F.3d 550, 554 (7th Cir. 2006); Ameritech Benefit Plan Comm. v. Communication Workers of Am., 220 F.3d 814, 821 (7th Cir. 2000). However, the inferences construed in the non-moving party's favor must be drawn from specific facts identified in the record that support that party's position. See Szymanski, 231 F.3d at 364. Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hospital and Medical Center, 328 F.3d. 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

## B. The Rehabilitation Act

### 1. Substantive Law

In order to establish a prima facie case under the Rehabilitation Act, a plaintiff must establish that: "(1) he suffers from a substantial limitation of a major life activity (i.e., he is disabled under the terms of the statute); (2) he is otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (3) he has suffered an adverse employment decision because of the disability." Scheerer v. Potter, 443 F.3d 916, 918-19 (7th Cir. 2006) (citing Peters v. City of Mauston, 311 F.3d 835, 842 (7th Cir. 2002)).

In order to establish a "substantial limitation of a major life activity," a Plaintiff must show that "during the pertinent time period he was either prevented or severely restricted from such major daily tasks, such as walking, eating, or sleeping." Scheerer, 443 F.3d at 919. In order to survive summary judgment, "the plaintiff must provide specific facts establishing that there is a genuine issue of material fact as to whether he is substantially limited in a major life activity." Id. This is "a high standard to meet." Id. Not every physical impairment that affects a major life activity is considered disabling. See Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 505-06 (7th Cir. 1998).

8

## 2. Garg's Claims under the Rehabilitation Act

### a. Garg's allergy was only temporary

Garg alleges that she suffered from a "night-time" dust allergy that caused an itchy skin rash and blemishes that diminished her social life. See Def.'s Stmt. of Mat. Facts, ¶¶ 42, 44. However, Garg submits no evidence, in the form of physician testimony or other medical documents, that establishes that her allergy was a "substantial limitation on a life activity." At most, Garg's allergy limited her social life because she became self-conscious about her physical apperance. However, diminished social interaction is not an activity that "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." Burks v. Wisc. Dep't of Trans., 464 F.3d 744, 755 (7th Cir. 2006). Despite her diminished social interaction, Garg claims that she can still stand, stoop, walk, see, dress herself, cook, go grocery shopping, and generally support herself. See Def.'s Stmt. of Mat. Facts, ¶ 47.

Based on the evidence in the record, Garg's allergy was merely temporary. Garg claims that this allergy prohibited her from handling mail on the night shift at the Palatine facility, and that she never encountered a problem handling mail before she worked in Palatine. However, the inability to do one job for one employer does not make Garg substantially limited in her job under the Rehabilitation Act. See Skorup v. Modern Door Corp., 153 F.3d 512, 514 (7th Cir. 1998). Moreover, there is nothing in the record to demonstrate that Garg was substantially limited in any other life activities. Her only claim is that her allergy limited her ability to sort mail. She was able to perform day to day activities, including those "basic activities that the average person in the general population can perform with little or no difficulty." Dalton v. Subaru-Isuzu Auto, Inc., 141 F.3d 667, 675 (7th Cir. 1998).

Moreover, there is no evidence that the Postal Service classified Garg as "disabled" or that she had a record of any qualifying disability. See Scheerer, 443 F.3d at 919; Rooney v. Koch Air, LLC, 410 F.3d 376, 381 (7th Cir. 2005). The Postal Service merely stated that Garg could not return to her job until the source of her allergy was determined. This, however, does not demonstrate that the Postal Service believed that Garg had any record of disabilities. The Postal Service had merely wanted to provide a safe work environment for its employee. When Garg was unable to substantiate her claim that the dust at the Palatine facility caused her allergy, the Postal Service terminated her employment. As a result, there is no evidence in the record to support the second and third prong of Garg's discrimination claim under the Rehabilitation Act. Therefore, summary judgment must be entered in favor of the Postal Service.

### b. The Postal Service made reasonable accommodations for Garg

In addition to no being able to prove she is disabled, Garg cannot establish that the Postal Service refused to make reasonable accommodations in order to enable Garg to complete her job. See Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 863-64 (7th Cir. 2005). Under the Rehabilitation Act, an employer is only liable if "an employee can establish that reasonable accommodations exist that would have enabled that person to perform the essential functions of his or her job." Jackson v. City of Chicago, 414 F.3d 806, 812-13 (7th Cir. 2005).

Garg alleges that the Postal Service should have assigned her to a different position within the Palatine facility, or found her a job in a different federal agency. However, the Postal Service is not required to provide the exact accommodations Garg requests. An employer must only make accommodations that are "reasonable in terms of cost and benefits." Mays v. Principi,

10

301 F.3d 866, 870-71 (7th Cir. 2002). Garg states that she is unaware of any open positions that she was qualified to fill.

Moreover, the court notes that Garg never requested a different accommodation from the Postal Service. Despite this, the record demonstrates that the Postal Service went to great lengths to accommodate Garg. The Postal Service moved Garg to the data entry room on tour 3 for seven months between September 2000 through April 2001, and allowed her to work shortened hours on tour 1 between April and May 2001, until Garg was found not fit for duty. When the Postal Service requested that Garg present objective medical evidence of her allergy, she failed to do so and her doctors could not point to any specific factors in the Palatine facility that she could avoid, in order to prevent further allergic reactions. Because Garg was unable to provide any medical evidence to support her medical claim, and because the volume of mail on tour 1 is the highest of the day, the Postal Service could not grant Garg a permanent shift change from her assigned tour. When faced with the option to avoid termination, Garg cancelled her appointment, and failed to reschedule.

### c. *Garg's Constructive Discharge Claim fails*

In Count II of her Complaint, Garg alleges that she was constructively discharged from her job as a result of the Post Office's failure to comply with the Rehabilitation Act. Compl., ¶¶ 30, 31. As a threshold matter, the court notes that there was no "constructive discharge" because Garg was literally discharged from the job in Palatine. The "working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because . . . an employee is expected to remain employed while seeking redress." Patton v. Keystone RV Co., 455 F.3d 812, 818 (7th Cir. 2006).

11

In order to maintain a claim for constructive discharge, Garg "must show that her working conditions were 'so intolerable that a reasonable person would have felt compelled to resign.'" Id. (quoting Pa. State Police v. Suders, 542 U.S. 129, 147 (2004)).

Garg cannot proceed on her constructive discharge count because she voluntarily left the Postal Service, and failed to "remain employed while seeking redress." See Patton, 455 F.3d at 818. When Garg filed her complaint with the EEO, she only complained about the denial of an accommodation, her denial of a pay increase, and the denial of a leave request. She never complained of a hostile work environment. The types of claims Garg raised in her EEO claim are separate and distinct from her constructive discharge allegation in her federal complaint. See Sitar v. Ind. Dep't of Transp., 344 F.3d 720, 726 (7th Cir. 2003). As a result, summary judgment is proper as to the Post Office on Count II of the Complaint.

### III. CONCLUSION

For the foregoing reasons, the court grants Defendant's Motion for Summary Judgment.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATED: 5/30/07